## IN RE AMERICAN TAX CREDIT PROPERTIES LIMITED PARTNERSHIPS.

### Civil Action No. 15826.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 17, 1997.
Decided: Dec. 5, 1997.

---

Craig B. Smith and Robert J. Katzenstein, of Smith, Katzenstein & Furlow, L.L.P., Wilmington, for plaintiff.

Alan J. Stone and David J. Teklits, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

## OPINION

LAMB, Vice Chancellor.

### I. *Introduction*

Trial in this consolidated action was held on September 29, 1997. At issue is whether the defendant partnerships, American Tax Credit Properties II L.P. ("ATC II") and American Tax Credit Properties III L.P. ("ATC III"), are required to provide plaintiff Everest Properties, Inc. ("Everest") with a copy of the current list of names, addresses and ownership interests of limited partners pursuant to section 17–305 of the Delaware Revised Uniform Limited Partnership Act ("DRULPA") and section 9.1 of the respective partnership agreements. The outcome in both cases turns on whether plaintiff became a "substitute limited partner" of the respective partnerships or is merely the assignee of economic rights of its transferor. Thus, the issue is similar to that decided by this Court in *Monterey Investments, Inc. v. Healthcare Properties, L.P.,* Del. Ch., C.A. No. 15519, Steele, V.C., 1997 WL 367038 (June 26, 1997) and other recent cases. For the reasons discussed *infra* I find that plaintiff is a substitute limited partner of both partnerships and as such is entitled to the lists at issue.

### II. *Background*

#### A. *The Defendant Partnerships*

Defendants American Tax Credit Properties II L.P. and American Tax Credit Properties III, L.P. (collectively "defendant partnerships") are Delaware limited partnerships organized in 1988 and 1989, respectively, for the purpose of investing in other limited partnerships which are eligible to receive low income housing tax credits. Defendant Richman Tax Credit Properties II, L.P. ("Richman II") is the sole general partner of ATC II. Richman Tax Credits Inc. ("Richman Credits") in turn is the sole general partner

of Richman II. Defendant Richman Tax Credit Properties III, L.P. ("Richman III") is the sole general partner of ATC III. Richman Housing Credits Inc. ("Richman Housing") in turn is the sole general partner of Richman III.

### B. Admission of Transferees of Limited Partnership Units

Both the ATC II and ATC III partnership agreements (collectively "Partnership Agreements"), contemplate the admission of transferees of limited partnership units as either assignees or substitute limited partners. This distinction is significant. An assignee of limited partnership units who does not become a substitute limited partner obtains economic rights in the defendant partnerships but does not obtain the other rights enjoyed by limited partners, such as the right of access to partnership books and records or voting rights. (*See* Partnership Agreements, § 7.2(c))

### 1. Admission as an assignee

The ability of limited partners to assign partnership units is subject to restrictions primarily designed to prevent the partnership units from being publicly traded, thus protecting the limited partnerships' tax status and avoiding potential adverse tax consequences. (*See* Partnership Agreements, § 7.1) Additionally, a limited partner may not assign a partnership unit without the consent of the general partner, which consent may not be unreasonably withheld. (*See* Partnership Agreements, § 7.1(d)(2)) Subject to these restrictions limited partners are free to assign their partnership units. There is no dispute, in this matter, that Everest and its transferor satisfied the requirements of the Partnership Agreements for admission as an assignee, or that the general partner, acting through their agent, consented to such admission.

### 2. Admission as a substitute limited partner

The Partnership Agreements also expressly contemplate the admission of assignees of limited partnership units as substitute limited partners. Section 7.2(d) of the Partnership Agreements provides for the admission of an assignee of units as a substitute limited partner provided that certain conditions are satisfied, including the following: (1) the instrument of assignment sets forth the intention of the assignor that the assignee succeed to the assignor's interest as a limited partner in his place; (2) the assignee shall have fulfilled the requirements for admission as an assignee; (3) the assignee shall have agreed to sign and be bound by the Partnership Agreements and related documents or amendments thereto;[1] and (4) "the General Partner shall have consented to such substitution, which consent may be withheld for any reason." (*See* Partnership Agreements, §§ 7.2(d) and 12.2)

### C. ML Fund

ML Fund Administrators Inc. ("ML Fund") is an entity affiliated with Merrill Lynch & Co., Inc., which underwrote the offerings of the partnership units. According to the Partnership Agreements, ML Fund provides a variety of "administrative services" to the partnerships and the limited partners.[2] In addition, although not among

1. As noted, defendants concede Everest's admission as an assignee. There is also no dispute that the transfer application executed by Everest (i) gave its power of attorney for it to become a signatory to the Partnership Agreements and related documentation, and (ii) expressed its agreement to accept and be bound by the terms of those agreements.

2. While a written services contract between ML Fund and the partnerships apparently does exist, neither plaintiff nor defendants sought to introduce it into evidence. At the post-trial argument, however, counsel for the defendant partnerships stated that the services contract did not contain a provision addressing the disputed issues in this case.

While not all inclusive, the Partnership Agreements do specify some of the services which ML Fund provides, including the following: (1) preparation and dissemination of the partnerships' financial statements; (2) coordination of tax returns and the distribution of tax information to the limited partners; (3) preparation of the quarterly and annual reports of the partnerships provided by the general partners and others; and (4) maintenance of communications (in coordination with the general partners) with limited partners. In coordination with the distribution of mailings, ML Fund provides the names and addresses re-

the powers expressly delegated to ML Fund in the Partnership Agreements, the defendants concede that ML Fund also functions as transfer agent for the partnerships. In this connection, ML Fund prepares and processes the forms that are used by persons making application for the transfer of units.

ML Fund acts on behalf of the partnerships in every aspect of the relations between the partnerships and the limited partners or other investors. All correspondence regarding the partnerships is distributed by ML Fund. While the letterhead indicates that correspondence originated from ATC II and ATC III, the originating address listed is that of Investor Services, which is in fact ML Fund. Additionally, the partnerships' annual reports state that all questions regarding an interest holder's interest, or the partnerships' activities or operations should be directed to Investor Services (*i.e.*, ML Fund).

The evidence shows that ML Fund maintains the only current list of limited partners. This list is maintained, among other reasons, for the purpose of communicating with the limited partners regarding the partnerships including the sending out of quarterly and annual reports. Section 3.3 of the Partnership Agreements provides for the creation of a list of the names and addresses of the limited partners which information is required to be set forth in Schedule A to those agreements. (Partnership Agreements, § 3.3(d)) Section 7.2 further mandates that

Schedule A be amended at least once each calendar quarter. (Partnership Agreements, § 7.2(e))

In this litigation, the defendants take the position that the list maintained by ML Fund is not Schedule A and is not a list of limited partners at all. At the same time, the general partners of the defendant partnerships do not seem to know who, other than ML Fund, is responsible for maintaining Schedule A or where, other than in the records maintained by ML Fund, it may be found.[3]

### D. Everest's Purchase of Limited Partnership Units

In November of 1996, Everest, with the assistance of the Chicago Partnership Board,[4] entered into purchase agreements to acquire five limited partnership units in each of ATC II and ATC III.[5] In connection with the transfer of ownership of the limited partnership units, the Chicago Partnership Board filled out and forwarded to ML Fund various forms, including the purchase agreements and other documents, for the purpose of facilitating the transfer of the partnership units of ATC II and ATC III from the seller to Everest. These were in the form used by ML Fund and followed exactly those prescribed by the National Association of Securities Dealers ("NASD").

The NASD prescribed forms resulted from a public rulemaking proceeding conducted by

---

flecting the holders of partnership interests on a specific date.

3. At her deposition Gina Scotti, corporate secretary of the general partners, stated that Schedule A, if they had it, would probably be located in a closing binder. According to Ms. Scotti, for each investor closing a closing binder would be created and a Schedule A would be attached to the partnership agreement located in the closing binder. Ms. Scotti further testified that Neal Ludeke is the person who retained the closing binders.

4. The Chicago Partnership Board is a broker dealer providing matching services for limited partnerships. The Board essentially acts as a clearing house, matching individuals seeking to sell limited partnership units with individuals seeking to purchase limited partnership units. In this regard the Board acts as an intermediary as well as an attorney-in-fact for the buyer and seller, and facilitates the paperwork necessary to complete the transfer of partnership units. Be-

cause the units in the defendant partnerships are not intended to be publicly traded (in order to protect important tax advantages), the Partnership Agreements require transferors to effect transfers of their units only through broker dealers whose procedures the general partner has determined are not incident to a public trading market. The Board provides such a matching service.

5. The purchase agreement contained language indicating the seller's desire to sell and assign to the transferee "all of the seller's right, title and interests" and also that it become "effective as of the date the transferee becomes a substitute limited partner on the books and records of the Partnership." This provides some evidence of the transferor's desire that Everest succeed to all of the transferor's interest in the defendant partnerships as of the date of the transfer of the partnership units.

that self-regulatory organization for the purpose of amending its Uniform Practice Code to require member organizations to use standardized transfer forms when transferring interests in limited partnerships. The forms are intended to provide a uniform "one size fits all" way to make uniform the format for gathering transfer information by members and registered representatives, reduce the information necessary to perform a valid transfer, and eliminate delays and inefficiencies in the transfer and settlement process. (See NASD Notice to Members 96–14, March, 1996) On January 29, 1996, the United States Securities and Exchange Commission ("SEC") approved the proposed amendments which became effective May 15, 1996. The standardized transfer forms include the following:

(1) Transferor's (seller's) Application for Transfer;

(2) Transferee's (buyer's) Application for Transfer;

(3) Registration Confirmation Form; and (4) Distribution Allocation Agreement.

### 1. Request for admission as substitute limited partner

The documents forwarded to ML Fund by the Chicago Partnership Board were identical to those required to be used by NASD members and included: (1) the Transferor's (seller's) Application for Transfer; and (2) the Transferee's (buyer's) Application for Transfer. Both applications contained similar language indicating the transferor's intent to transfer and assign, and the transferee's

desire to accept "all rights and interests [of the partnership]" as well as the transferor's and transferee's intent for the transferee to "succeed [the transferor] to such interest as a Substitute Limited Partner, successor in interest or assignee."[6]

The defendants urge that, because the form uses the disjunctive in referencing the interest to which the transferor is to succeed, Everest did not effectively request the general partners' consent to its admission as a substitute limited partner. That is, defendants argue that because the NASD form includes references to "successor in interest" and "assignee," in addition to "Substitute Limited Partner," as possible interests to which the transferee could succeed, Everest did not adequately request admission as a substituted limited partner.

Even if the NASD-mandated transfer application form was ambiguous (*but see* discussion, *infra*, pp. 92–93), there is other documentary evidence which substantiates Everest's contention that it requested admission as a substituted limited partner. In the course of discovery, ML Fund produced from its files a Registration Confirmation Form, dated January 15, 1997, which identifies Everest as registered owner of the "Partnership interests" and references ATC III's partnership tax identification number. (*See* Pl.'s Tr.Exh. 33) The document produced is in the form required by the NASD Uniform Practice Code. The confirmation form states "[y]our transfer request has been processed. The effective/admission date as a limited partner in the partnership is indicated below."[7] Everest did not pro-

---

**6.** The transferor's (seller's) application for transfer which the Chicago Partnership Board forwarded to ML Fund provided as follows:

[t]he transferor hereby makes application to transfer and assign, subject to the general partner's rights, to the transferee all rights and interests, as set forth in the partnership below and for the transferee to succeed to such interest as a Substitute Limited Partner, successor in interest or assignee.

Plaintiff's Trial Exhs. 7 and 11. Similarly, the transferee's (buyer's) application for transfer provides as follows:

[t]he transferee hereby makes application to accept, subject to the general partner's rights, from the transferor all rights and interests, as set forth in the partnership below, and intends

to succeed the transferor as a Substitute Limited Partner or Assignee and agrees to accept all the terms and conditions of the partnership agreement and related documents.

Plaintiff's Trial Exhs. 8 and 12.

**7.** The Registration Confirmation Form provides in full as follows:

[y]our transfer request has been processed. The effective/admission date as a limited partner in the partnership is indicated below. Information pertaining to your account has been entered, pursuant to the Partnership Agreement, on the Partnership's records as shown. This documentation informs you of your registration in the Partnership and should be retained with your permanent records.

duce a copy of this form from its files, nor did the Chicago Partnership Board.

At her deposition, the ML Fund representative asserted that the confirmation form, although found in ML Fund's files and produced by it, were not documents which ML Fund prepared, nor were they the type of documents which ML Fund would supply to persons seeking to transfer partnership units.[8] The Registration Confirmation Form is one prescribed by the NASD and mandated for use by its members. From this, I conclude that this form was sent to ML Fund by Chicago Partnership Board as part of its package of NASD-mandated forms seeking transfer of partnership units to Everest.[9] It clearly evidences Everest's request for admission as a substituted limited partner.

### 2. Consent to admission as substitute limited partner

Following receipt of the application for transfer of the limited partnership units, ML Fund reviewed and processed the documentation and on January 21, 1997, approved the transfers and registered five units of ATC II and ATC III in the name of Everest. ML Fund's records further indicate that Everest became the registered owner of the limited partnership units as of April 1, 1997. The discovery record shows that ML Fund added Everest to the database, maintained by it, of limited partners of both defendant partnerships. Specifically, ML Fund produced a computer screen printout which shows Ever-

est's interest in ATC II and ATC III, the date the transfer was approved, and, most significantly, Everest's status as a partner of the defendant partnerships. Additionally, all correspondence sent to Everest after the effective date of the transfer of partnership units addresses Everest not as an assignee, but as a limited partner. At some point after the transfer of the partnership units to Everest, a request was made to ML Fund for Everest's status vis a vis the defendant partnerships. In response to the request, ML Fund sent a letter, dated May 6, 1997, to Everest stating "[t]he sale of ownership that was requested in the above-named limited partnership is effective as of 04/01/97." (*See* Pl.Tr.Exh. 21).

On July 16, 1997, in accordance with section 17–305 of DRULPA and section 9.1 of the defendant Partnership Agreements, Everest made a written request for a copy of a current list of names, addresses and interest owned by each holder of limited partnership units of the partnerships.[10] The defendant partnerships responded by sending a letter dated July 25, 1997 requesting additional information in order to assess the appropriateness of the demand letter.[11] On July 28, 1997, Everest filed this action for a determination of its entitlement to the lists of limited partners.

### III. Discussion

Plaintiff contends that it has satisfied all of the requirements of the Partnership Agree-

---

Plaintiff's Trial Exh. 33.

8. At her deposition, the ML Fund representative also stated that she was not sure if the specific forms used in this case were supplied by ML Fund; however, she did state that the documents were NASD documents, that they mirrored those ML Fund uses in connection with the transfer of partnership units, and that they met the requirements ML Fund has established for the purpose of transferring units of the defendant partnership.

9. The corresponding form relative to the ATC II transfer request was not produced by ML Fund. Instead, ML Fund produced another Registration Confirmation Form wholly unrelated to either Everest or the defendant partnerships. I do not attribute any significance to the absence of the second Registration Confirmation Form.

10. In the demand letter Everest stated that its purpose in requesting the list of names and addresses of unit holders as well as the number of units held by each was to assist Everest in increasing its ownership of units in the partnership by enabling them to make tender offers to unit holders to purchase their units.

11. In its response to Everest's request for the list of names and addresses of the limited partners, the defendant partnerships requested that Everest provide, among other information, the following: (1) the number of units owned by Everest and the dates they were purchased; (2) the basis for its belief that Everest's proposed offer to purchase units is a proper ground under applicable law to receive the requested information; and (3) compliance of the proposed offer with Article Seven of the defendant partnership agreements.

ments necessary for becoming a substitute limited partner and that the general partners, through the actions of ML Fund, have consented to its admission as a substitute limited partner. Everest argues that ML Fund was expressly or impliedly authorized to give such consent or, at a minimum, acted with apparent authority in doing so. Defendants, on the other hand, contend the general partners did not consent to Everest's admission as a substitute limited partner, and further that plaintiff failed even to make a request for such admission.

Plaintiff's entitlement to the relief it seeks turns on whether it requested admission as a limited partner and, if so, on whether the general partners of ATC II and ATC III consented to Everest's admission as a substitute limited partner.

### A. Everest Requests Admission as Substitute Limited Partner

■ The evidence adduced in discovery indicates that Everest did in fact request admission as a substitute limited partner of the defendant partnerships. Both the transferor's and the transferee's application for transfer of partnership units stated that they were requesting the transfer of "all rights and interests as set forth in the partnership below" and also that the transferor and transferee "succeed to such interests as a substitute limited partner, successor in interest or assignee." While the defendants argue that the language is ambiguous as to which interest the transferee wished to succeed, I am persuaded to read these forms as requesting admission as a substitute limited partner first, and then only, if that request was refused, for admission as successor in interest or assignee. This reading is supported (at least in the case of ATC III) by the Registration Confirmation form produced from ML Fund's files.

I also conclude that it is appropriate to give a broad reading to the NASD forms so as to give them the fullest effect permissible in the circumstances, and thus, to accomplish the purpose underlying their adoption by the NASD and approval by the SEC. Of course, the NASD rulemaking did not, and could not, change the substantive operation, under De-

laware law, of the Partnership Agreements. For example, the NASD forms do not dispense with the need to obtain the consent of the general partners. However, those forms were adopted specifically to facilitate and make uniform the process by which partnership units are transferred and requests for admission, as either a substitute limited partner or assignee, are made. It is inconsistent with that purpose to read the NASD forms narrowly, as suggested by defendants. Therefore, even without regard to the one Registration Confirmation Form produced by ML Fund, I find that the transfer application forms adequately express both the transferor's and Everest's request that Everest be admitted as a substitute limited partner.

*Monterey Investments, Inc. v. Healthcare Properties, L.P.*, Del.Ch., C.A. No. 15519, Steele, V.C., 1997 WL 367038 (June 26, 1997), is not inconsistent with this conclusion. In *Monterey*, Vice Chancellor Steele was asked to consider whether or not the language of a partnership agreement requiring the seller "to express clearly the seller/assignor's intent to assign, wholly or partially, its precise partnership interest" was satisfied by a purchase agreement expressing "nothing more than the seller/assignor's assignment of 'certain rights to limited partnership interests ... on the terms and conditions specified in these Purchase Documents.'" *Monterey* at *7. The NASD forms at issue here expressly request Everest's admission as a substitute limited partner and, thus, differ critically from the purchase agreement form discussed in *Monterey*. Rather, the NASD forms at issue here bear a strong resemblance to the "agreement of transfer" forms which Vice Chancellor Steele held, in that same case, to satisfy the requirements of the partnership agreement that a request be made of the general partner. *Id.* at *9.

### B. ML Fund Consents to Substitution as Limited Partner

The Partnership Agreements define "consent" to include "prior written consent," or "the act of granting such consent, as the context may require." (Partnership Agreements, Article Two) Thus, while the general partners must consent to the substitution of

Everest as a limited partner, that consent may consist of a writing granting consent, as was expressly required by the partnership agreement at issue in *Monterey,* or the act of authorizing the admission of Everest as a substitute limited partner. Unlike the situation in *Monterey,* therefore, the Partnership Agreements at issue here do not require that the general partners evidence their consent in a writing.

■ There is, of course, no evidence that the general partners themselves ever even considered Everest's requests for admission as a substitute limited partner. Rather, it is clear from the record that ML Fund alone considered those requests. The evidence also demonstrates that ML Fund processed Everest's requests and consented to Everest's admission by the act of registering the transfers, entering Everest's name in the partnership records as a limited partner of both partnerships, and confirming to Everest that the transfer it requested had been accomplished. I find that, assuming ML Fund was authorized to give consent to Everest's admission as a substitute limited partner, these acts of ML Fund plainly evidence that consent was given. Thus, the issue is whether ML Fund was authorized to do so either expressly or impliedly.[12]

### 1. Power to delegate

■ Section 5.1 of the defendant Partnership Agreements grant the general partners the exclusive discretion to manage and control the business of the partnership.[13] (Partnership Agreements, § 5.1(a)) There is no statutory provision regarding the delegation of authority by a general partner, rather "the specific rights and responsibilities of parties in a general or limited partnership are determined by the parties' particular partnership agreement." *Katell,* at 4–5 (citing 6 *Del.C.* §§ 17–403(a) and 1101(c)). *See also Monterey* at *13 (noting obligation to refer to terms

of partnership agreement when determining legal status in limited partnership).

■ Section 5.5 of the Partnership Agreements provides that each of the general partners has the power to delegate its authority, including the power to do the following:

"delegate any or all of the powers, rights and obligations [under the Partnership Agreements], and may appoint, employ, contract or otherwise deal with any Person for the transaction of the business of the Partnership, which Person may, under supervision of the General Partner, perform *any* acts or services for the Partnership as the General Partner may approve."

(Partnership Agreements, § 5.5(h)) (emphasis added) The general partners, therefore, had the power to delegate the performance of any acts or services under the Partnership Agreements for which the general partner is responsible, including the act of consenting to the admission of an assignee as a substitute limited partner.

### 2. ML Fund's authority to consent to Everest's admission

■ There is no dispute that the general partners of the defendant partnerships delegated substantial responsibility for the transfer of limited partnership units to ML Fund. The defendants concede that ML Fund is the transfer agent for the defendant partnerships, and that ML Fund is authorized to review and approve the paperwork before recording the transfer of partnership units. They concede ML Fund is authorized to consent to the admission of transferees as assignees, and further concede that ML Fund maintains *all* communications with the limited partners concerning the transfer process. In sum defendants concede that ML Fund is authorized to perform every function pertaining to the transfer of partnership units, including the determination of whether the provisions of the Partnership Agreements have been satisfied, except, they ar-

---

12. Plaintiff appears to have abandoned its argument based on equitable estoppel. *See* Pl.'s Post–Trial Reply Brief at 14.

13. Section 5.1 of the Partnership Agreements parallels section 17–403 of DRULPA which vests general partners of limited partnerships with the

sole authority to manage the partnership affairs. 6 *Del.C.* § 17–403(a); *Katell v. Morgan Stanley Group, Inc.,* Del.Ch., C.A. No. 12343, Chandler, V.C., 1993 WL 205033 (June 8, 1993) Mem. Op. at 4.

gue, ML Fund is not authorized to consent to the admission of an assignee as a substitute limited partner.

To support this argument, the defendants rely principally on the testimony of Neal A. Ludeke, Vice President and Treasurer of the two general partners. At trial, Mr. Ludeke testified, conclusorily, that ML Fund has "no role or authority" with respect to the admission of substitute limited partners. (Tr. Trans. 67). Defendants also rely, although to be a less clear purpose, on the deposition testimony of Margaret A. Burke, Manager of the Investor Communications Group of ML Fund, to the effect that (i) the ML Fund records do not distinguish between limited partners and assignees (Burke Depo. 14–15), and (ii) ML Fund never consults with the general partners when processing transfer requests. (*Id.* at 53).

Mr. Ludeke's other testimony at trial undermines defendants' litigation position by showing the general partners' complete lack of information about or involvement in the transfer of partnership interests, or the admission of assignees as substitute limited partners. At trial, Ludeke testified that:

·  he never sees the documentation relating to the transfer of partnership interests (Tr. Tran. 84);
·  since the closing on the sale of partnership units (seven to nine years ago) he has not "seen anything that would look like a Schedule A" and cannot say if Schedule A was amended since that time to reflect changes in the composition of the group of limited partners (*See* Tr. Tran. 78 and 81–82);
·  no request has ever been made to the general partners for the admission of anyone as a substitute limited partner [14] (Tr. Tran. 88); and
·  he does not know if anyone has ever made such a request of ML Fund, has

ever inquired of ML Fund about that subject and does not know if any other person from the general partners has made such inquiry. (*Id.*)

Moreover, in deposition, neither representative of the general partners, Mr. Ludeke and Ms. Gina Scotti, could say where Schedule A was kept or who kept it. Ms. Scotti said that Schedule A was in the closing binders relating to the offering of the partnership units and was in Mr. Ludeke's possession. Mr. Ludeke thought Ms. Scotti had it.

Considered as a whole, the evidence shows convincingly that ML Fund has routinely performed all of the functions associated with the transfer of partnership units, including giving consent to the admission of both assignees and substitute limited partners. Thus, I reject as unsubstantiated defendants' assertion that ML Fund lacked authority and find that the general partners have delegated all transfer responsibilities to ML Fund, either expressly or impliedly by their complete failure otherwise to instruct ML Fund or to establish procedures at the general partner level for the processing of requests for admission as a substitute limited partner. Indeed, the most likely conclusion to be drawn from the evidence presented is that the general partners simply paid no attention at any time to any transfer or any request for admission as a substitute limited partner, leaving those matters entirely to ML Fund. This is hardly surprising in the circumstances. Until Everest wrote in July 1997, requesting a copy of the partnerships lists, the general partners had never had any reason to distinguish between assignees and substitute limited partners and in fact had made no such distinction.

### 3. Everest's insouciance is no defense

Defendants rely on the testimony of David Lesser, Executive Vice President of Everest,

---

**14.** Defendants' claim that no request for admission has ever been made to the general partners (as opposed to ML Fund) for admission as a substitute limited partner is not meaningful in the context. This Court has found that the NASD approved and mandated forms submitted to ML Fund in this matter (and, presumably, in other instances) contain a request for admission as a substitute limited partner. Delivery of ML Fund (the agent) is all that was required. In accordance with established practice, those requests were processed and approved by ML Fund, Everest's name was entered in the records as a partner and the transfer was confirmed to Everest. he fact that these steps were all taken pursuant to delegated power, rather than by the general partners themselves, is insignificant.

in conjunction with the decision in *Monterey*, to argue that Everest's own insouciant or inattentive behavior precludes it from relying on the action taken by ML Fund to establish Everest's status as a limited partner. Defendants point to Mr. Lesser's testimony that he was aware of the distinction between an assignee holder and a substitute limited partner and that under certain partnership agreements assignees are limited to economic rights. (Tr. Tran. 39–40) Further, defendants cite Mr. Lesser's testimony that despite his awareness of this distinction he never reviewed the defendant Partnership Agreements to ascertain the requirements for becoming a substitute limited partner. (Tr. Tran. 42–43) Defendants then draw a comparison between Everest's behavior and the Court's finding in *Monterey* that it was wholly unreasonable for the plaintiffs there to rely upon the confirmation forms, which did not specifically reference their admission as a substitute limited partner, to determine their legal status in the limited partnership. *See Monterey* at *13.

■ Here ML Fund had the actual authority to consent to Everest's request for admission as a substitute limited partner. Thus, the issue of the reasonableness of Everest's reliance is irrelevant, as Everest does not rely on the theory of equitable estoppel discussed in *Monterey*. I also note that the transfer forms at issue in *Monterey* were not the NASD-mandated forms at issue here. As previously discussed, the NASD forms were developed and authorized by the SEC specifically for the purpose of facilitating the transfer of partnership interests between buyers and sellers. The natural import of this is that parties using the NASD forms, unless they are otherwise specifically advised or the partnership agreement is to the contrary, should be entitled to rely on them as sufficient to accomplish the transfer therein requested.

\* \* \*

Ultimately, I conclude that the central premise of defendants' position must fail. The evidence, considered as a whole, does not support defendants' attempt to maintain, at once, that ML Fund was authorized to

consent (and in this case did consent) to the admission of Everest as an assignee but was not authorized to consent to its admission as a substitute limited partner. It could be that ML fund was *expressly* authorized to do neither one nor the other. Nevertheless, the evidence convincingly shows that ML Fund has routinely done both, and I conclude that it was authorized to do so, expressly or impliedly, by the general partners.

### IV. *Conclusion*

For all the foregoing reasons, I conclude that Everest is a substitute limited partner of the defendant partnerships and, as such, is entitled to the entry of an order requiring that the defendant partnerships furnish it with the current lists of their limited partners derived from the ML Fund databases.

IT IS SO ORDERED.